# United States Court of Appeals for the Federal Circuit

---

**MOBILITY WORKX, LLC,**
*Appellant*

**v.**

**UNIFIED PATENTS, LLC,**
*Appellee*

**ANDREW HIRSHFELD, PERFORMING THE FUNCTIONS AND DUTIES OF THE UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE,**
*Intervenor*

---

2020-1441

---

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2018-01150.

---

Decided:  October 13, 2021

---

DAVID A. RANDALL, Hackler Daghighian Martino & Novak, Los Angeles, CA, argued for appellant.  Also represented by MICHAEL MACHAT, Law Offices of Michael Machat, PC, West Hollywood, CA.

JASON R. MUDD, Erise IP, P.A., Overland Park, KS, argued for appellee. Also represented by ERIC ALLAN BURESH; ASHRAF FAWZY, JONATHAN RUDOLPH KOMINEK STROUD, Unified Patents, LLC, Washington, DC.

DANA KAERSVANG, Civil Division, Appellate Staff, United States Department of Justice, Washington, DC, argued for intervenor. Also represented by MELISSA N. PATTERSON; KAKOLI CAPRIHAN, SARAH E. CRAVEN, THOMAS W. KRAUSE, FARHEENA YASMEEN RASHEED, Office of the Solicitor, United States Patent and Trademark Office, Alexandria, VA.

ROBERT GREENSPOON, Dunlap, Bennett, & Ludwig, PLLC, Chicago, IL, for amicus curiae US Inventor, Inc.

---

Before NEWMAN, SCHALL, and DYK, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* DYK.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* NEWMAN.

DYK, *Circuit Judge*.

Mobility Workx ("Mobility") appeals a decision of the Patent Trial and Appeal Board ("Board") determining that claims 1, 2, 4, 5, and 7 of U.S. Patent No. 8,213,417 (the "'417 patent") were unpatentable as obvious. In addition to requesting a remand under *United States v. Arthrex, Inc.*, 141 S. Ct. 1970 (2021), and challenging the merits of the Board's decision, Mobility raises for the first time on appeal several additional constitutional challenges, including a challenge to the structure of the Board. We first address these other constitutional challenges because a determination that the Board is unconstitutionally structured or that the proceedings are otherwise unconstitutional would dispose of the case and make

consideration of the *Arthrex* issue or the merits unnecessary.

We conclude that Mobility's constitutional arguments are without merit. Without reaching the merits of the Board's decision, in light of *Arthrex*, we remand to the Acting Director to determine whether to grant rehearing.

BACKGROUND

I

Mobility is the owner of the '417 patent, which is titled "System, Apparatus, and Methods for Proactive Allocation of Wireless Communication Resources." '417 patent, col. 1 ll. 1–3. The patent is "generally directed to allocation of communication resources in a communications network." Appellant's Br. 7.

The Background section of the '417 patent explains that mobile communication systems are typically composed of mobile nodes (e.g., cell phones) that communicate with one another through a series of base stations. Base stations serve different zones or cells, such that when a mobile node moves from one cell to another, it must connect to a new base station. When a mobile node has connected to a new base station, i.e., when it is moving, it must let other mobile nodes know where it can be reached. This can be accomplished by having a mobile node register with a "home agent so that the home agent can remain a contact point for other nodes that wish to exchange messages . . . with the mobile node as it moves from one location to another." '417 patent col. 1 ll. 39–44.

This system allows a mobile node to "use two IP addresses, one being a fixed home address and the other being a care-of address." *Id.* col. 1 ll. 45–47. The home address is assigned by the home agent. The care-of address, on the other hand, is received when a mobile node moves out of its home network and connects to foreign networks using foreign agents that act "as wireless access

points distributed throughout a coverage area of a network or an interconnection of multiple networks." *Id.* col. 1 ll. 57–60. However, delays and information losses can occur when a mobile node moves from one foreign network to another because "the new communication link cannot be set up until the mobile node arrives in the new foreign agent's physical region of coverage." Appellant's Br. 8.

The '417 patent attempts to prevent these delays and data losses by using a ghost foreign agent and a ghost mobile node that "can be configured to register the mobile node and allocate resources for communicating with the mobile node according to a predicted future state of the mobile node." '417 patent col. 2 ll. 44–61. In other words, the ghost mobile node operates by "signaling the foreign agent before the mobile node arrives in the foreign agent's physical region of coverage, based upon the predicted future state of the mobile node." Appellant's Br. 9. This, in turn, increases the speed with which a mobile node can connect to a new network, reducing delays and avoiding information losses.

In 2017, Mobility brought suit for infringement of the '417 patent against T-Mobile and Verizon Wireless in the Eastern District of Texas (one of these proceedings has settled, and the other is stayed pending resolution of this appeal). On June 1, 2018, Unified Patents filed a petition seeking inter partes review of claims 1–7 of the '417 patent on the theory that those claims would have been obvious over U.S. Patent No. 5,825,759 in combination with several other references. On December 2, 2019, the Board issued its final written decision, determining that claims 1, 2, 4, 5, and 7 were unpatentable as obvious, but that claims 3 and 6 were not shown to be unpatentable. Mobility appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(4)(A).

## DISCUSSION

### I

For the first time on appeal, Mobility raises constitutional challenges to the USPTO's structure under the Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284 (2011).  Mobility argues that Board members have an impermissible financial interest in instituting AIA proceedings under the standard articulated in *Tumey v. Ohio*, 273 U.S. 510 (1927).  Mobility's *Tumey* challenge has two parts.  First, Mobility contends that Board members have an interest in instituting AIA proceedings to generate fees to fund the agency and ensure future job stability.  Second, Mobility contends that individual administrative patent judges ("APJs") have a personal financial interest in instituting AIA proceedings in order to earn better performance reviews and bonuses.

### A

Unified Patents and the government argue that Mobility forfeited these challenges because Mobility did not raise these theories before the Board.

Under Supreme Court and circuit precedent, agencies generally do not have authority to declare a statue unconstitutional.  *See Oestereich v. Selective Serv. Sys. Local Bd. No. 11*, 393 U.S. 233, 242 (1968) (Harlan, J., concurring in result) ("Adjudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies."); *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215 (1994) (agreeing with Justice Harlan's statement in *Oestereich*); *Riggin v. Off. of Senate Fair Emp. Pracs.*, 61 F.3d 1563, 1569 (Fed. Cir. 1995) (noting the "general rule that administrative agencies do not have jurisdiction to decide the constitutionality of congressional enactments").  It follows that constitutional challenges to the statute under

which the agency operates need not be raised before the agency. *See Weinberger v. Salfi*, 422 U.S. 749, 765 (1975) (determining that the requirement of administrative exhaustion would be met if "the Secretary [of the Department of Health, Education, and Welfare] has satisfied himself that the only issue is the constitutionality of a statutory requirement, a matter which is beyond his jurisdiction to determine, and that the claim is neither otherwise invalid nor cognizable under a different section of the Act"); *Celgene Corp. v. Peter*, 931 F.3d 1342, 1357 (Fed. Cir. 2019) (reaching constitutional challenge to the Board raised for the first time on appeal).

In any event, we have discretion to consider new arguments for the first time on appeal. *See Singleton v. Wulff*, 428 U.S. 106, 121 (1976) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases."); *Golden Bridge Tech., Inc. v. Nokia, Inc.*, 527 F.3d 1318, 1322–23 (Fed. Cir. 2008) ("[A]ppellate courts are given the discretion to decide" whether to consider arguments raised for the first time on appeal). Thus, we have "discretion to review a constitutional challenge not timely raised before the lower tribunal." *In re DBC*, 545 F.3d 1373, 1380 (Fed. Cir. 2008).

The government nonetheless argues that we should not address these arguments because they are dependent on the resolution of factual issues that should be presented to the PTAB in the first instance. Mobility did not in its opening brief request a remand to develop a more comprehensive record. We conclude that considering Mobility's constitutional challenges is appropriate because addressing these arguments does not require resolution of any disputed factual issues. *See Celgene*, 931 F.3d at 1357.

Mobility's challenge is based on various agency documents that Mobility argues can be judicially noticed.

Under the Federal Rules of Evidence, "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it: . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Judicial notice may be taken at any stage of a proceeding, including on appeal. Fed. R. Evid. 201(d).

Here, many of the proffered documents were published in the Federal Register or on the USPTO's website. Other agency documents were obtained through a Freedom of Information Act ("FOIA") request. One document is a report from the Congressional Research Service. These types of government documents are capable of being "accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).[1]

---

[1]    *See* 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed and without prejudice to any other mode of citation, may be cited by volume and page number."); *Euzebio v. McDonough*, 989 F.3d 1305, 1323 n.9 (Fed. Cir. 2021) (explaining that courts may take judicial notice of agency manuals); *Kareem v. Haspel*, 986 F.3d 859, 866 n.7 (D.C. Cir. 2021) (taking judicial notice of facts that "can be readily determined from reliable sources, such as the Congressional Research Service and State Department reports"); *In re Chippendales USA, Inc.*, 622 F.3d 1346, 1356 (Fed. Cir. 2010) (determining that this court could take judicial notice of the existence of a trademark because "the registration documents by the [US]PTO are 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned'" (quoting the 2010 version of Fed. R. Evid. 201(b)(2))); *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004) (determining that USPTO documents were "public records subject to judicial notice"); Fed. R. Evid. 201

The government argues that if Mobility had introduced these documents before the Board, the agency "would have had an opportunity to apply its expertise to the claims Mobility makes based on these documents, and additional documents relevant to these questions might have been added to the record to create a complete picture." Intervenor's Opp'n to Appellant's Mot. for Judicial Notice, ECF No. 45, at 4 (Oct. 9, 2020). Unified Patents takes the same position.

Because, as explained below, we determine that Mobility's documents, even considered in isolation, do not establish a due process violation, neither the government nor Unified Patents is prejudiced by our decision to take judicial notice of these documents and to resolve the issues to which they pertain without a remand.[2] We therefore grant Mobility's motion for judicial notice and address the due process issues.

## II

Mobility argues that the structure and funding of the Board violates due process. Three Supreme Court cases define the scope of due process in this area. The first of these cases is *Tumey v. Ohio*, 273 U.S. 510 (1927).

---

advisory committee's note to 1975 rule (stating that courts may take judicial notice of "facts relating to the personnel and records of the court . . . and other governmental facts").

[2] In a response (filed well after oral argument), Mobility argued for the first time that if the case were remanded pursuant to *Arthrex*, it should be allowed to further develop the factual record. We conclude that any such argument by Mobility is doubly forfeited: first, because the issue was not raised in its opening brief and second, because Mobility did not ask the Board to make any factual determinations.

In *Tumey*, the Supreme Court held that a defendant's conviction in a mayor's court violated due process because a convicted defendant was required to pay fees, and the mayor presiding over the proceedings received compensation if the defendant was convicted, but received no such compensation if the defendant was acquitted. *Id.* at 531–32. The Court additionally determined that the structure of the mayor's court violated due process because the fees paid by convicted parties also funded the village itself, and the mayor as "the chief executive of the village . . . [wa]s charged with the business of looking after the finances of the village." *Id.* at 533. The Court explained that

> [e]very procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused denies the latter due process of law.

*Id.* at 532.

The Court again addressed the constitutionality of a mayor's court in *Dugan v. Ohio*, 277 U.S. 61 (1928). In *Dugan*, the city had a "commission form of government, with five commissioners." *Id.* at 63. One member of the city commission served as mayor. *Id.* "The mayor ha[d] no executive, and exercise[d] only judicial, functions." *Id.* The mayor was paid a fixed salary determined by "the votes of the members of the commission other than the mayor" and received no fees from the mayor's court. *Id.*

The Supreme Court determined that this structure did not violate due process, distinguishing *Tumey*. *Id.* at 63–64. The Court emphasized that, unlike the mayor in *Tumey*, the *Dugan* mayor did not receive fees from the conviction of defendants but instead received a fixed salary. *Id.* at 65. The Court explained that while the

mayor's salary "[wa]s paid out of a fund to which fines accumulated from his court under all laws contribute, it [wa]s a general fund" and that the mayor "receive[d] a salary in any event, whether he convicts or acquits." *Id.* The Court therefore concluded that the mayor did not have an impermissible personal financial interest in convictions.

The Court additionally determined that the mayor did not have an impermissible interest in generating revenue for the city. *Id.* The Court distinguished *Tumey* as involving a mayor who served as "chief executive . . . responsible for the financial condition of the village" and "who by his interest as mayor might be tempted to accumulate from heavy fines a large fund by which the running expenses of a small village could be paid, improvements might be made, and taxes reduced." *Id.* By contrast, the *Dugan* mayor was "one of five members of the city commission" and thus had only a "remote" relation "to the fund contributed to by his fines as judge, or to the executive or financial policy of the city." *Id.*

Finally, in *Ward v. Monroeville*, the Supreme Court examined a mayor's court in which fines paid by convicted defendants were paid to the village and not to the mayor himself. 409 U.S. 57, 60 (1972). The Court again found a due process violation because the mayor had "executive responsibilities for village finances" that might "make him partisan to maintain the high level of contribution from the mayor's court." *Id.*

A

Mobility first argues that "the fee-generating structure of AIA review[] creates a temptation" for the Board to institute AIA proceedings in order to collect post-institution fees  (fees for the merits stage of the AIA proceedings) and fund the agency. Appellant's Br. 45. Mobility contends that the agency generates substantial revenue from these fees, calculating that "24% of the

PTAB's collections [are] dependent on instituting" AIA proceedings. Appellant's Br. 18–19.

Mobility contends that the Chief APJ, Deputy Chief APJ, and Vice Chief APJs participate in AIA review proceedings and "provide policy direction and ensure the quality and consistency of AIA decisions," *id.* at 33, while also "oversee[ing] fiscal planning and expenditures" of the Board, *id.* at 34.[3]   Thus, Mobility contends that these leadership APJs perform the "untenable dual role of managing the [Board's] finances in a 'business-like sense' and deciding AIA petitions solely on the merits." *Id.* Mobility concludes that this "impermissible mixing of judicial and administrative/executive roles" constitutes a violation of due process under *Tumey. Id.* at 36. Mobility points out that "at least one of the three panel APJ's [sic]" in its IPR proceeding "was a Vice Chief APJ at the time of Institution" and "another was an Acting Vice-Chief APJ." Appellant's Reply Br. 16. We think there is no merit to Mobility's argument.

Unlike the mayors in *Tumey* and *Ward*, the Chief APJ, Deputy Chief APJ, and Vice Chief APJs do not have responsibility for the agency's finances. While these leadership APJs assist the Director by preparing budget requests and executing the operating budget, "the Director, not the APJs, has responsibility for USPTO's budgetary request to the Office of Management and Budget, in consultation with the USPTO Public Advisory Committees." Intervenor's Br. 28. The leadership APJs' role in budgeting is therefore too remote to constitute a due

---

[3]    "The Office of the Chief Judge serves as the senior level executive management of the Board. The Office of the Chief Judge consists of the Chief Judge and the Deputy Chief Judge." J.A. 4614. In addition, the Vice Chief APJs "each manage a division consisting of judges and patent attorneys." J.A. 4615.

process violation. *See Dugan*, 277 U.S. at 65; *see also Doolin Sec. Sav. Bank, F.S.B. v. FDIC*, 53 F.3d 1395, 1407 (4th Cir. 1995).[4] The role of other APJs in the budgetary process is even more remote, and even less a due process problem.

More fundamentally, the USPTO is a fee-funded agency for "which Congress annually appropriates funds . . . based on annual USPTO fee collection estimates." Intervenor's Br. 3. The agency's fees for institution and post-institution work on AIA proceedings do not automatically become available to the agency. *See* Pub. L. No. 116-93, div. B, 133 Stat. 2317, 2389 (2019). Mobility contends that the reality is otherwise because "[i]n the last few years, Congress has appropriated to USPTO all the money [the USPTO] collects" and that the "Director effectively knows that the [US]PTO can set fees at the level it wants and retain all the fees it collects this year." Appellant's Reply Br. 9–10 (quoting Intervenor's Br. 4). Mobility also points out that the AIA created the Patent and Trademark Fee Reserve Fund for fees "collected in excess of the appropriated amount," arguing that such a fund creates an improper incentive to collect fees. Appellant's Br. 16–17 (citing 35 U.S.C. § 42(c)(2)).

Mobility's challenge cannot succeed. The President, not the USPTO, submits the budget, and Congress ultimately sets the USPTO budget. Congress similarly controls whether the USPTO has access to the surplus funds

---

    4    To the extent Mobility contends that any mixture "of executive and adjudicatory responsibilities in a single agency decisionmaker" is itself unconstitutional, this argument is without merit. *See Tumey*, 273 U.S. at 534 ("It is, of course, so common to vest the mayor of villages with inferior judicial functions that the mere union of the executive power and the judicial power in him can not be said to violate due process of law.").

collected in the Patent Trademark Fee Reserve Fund.  *See* 35 U.S.C. § 42(e)(4) (requiring the Secretary of Commerce to "provide to the Committees on the Judiciary of the Senate and the House of Representatives . . . any proposed disposition of surplus fees by the Office").  Congress may appropriate fees collected by the USPTO to other parts of the government. *Figueroa v. United States*, 466 F.3d 1023, 1027, 1032–33 (Fed. Cir. 2006).

Other courts of appeals have held that similar congressional control over an agency's budget eliminates any argument under *Tumey*.  In *Delaware Riverkeeper Network v. Federal Energy Regulatory Commission*, 895 F.3d 102 (D.C. Cir. 2018), the D.C. Circuit concluded that the funding structure of the Federal Energy Regulatory Commission ("FERC"), which required FERC to recover its annual operating costs from fees and charges paid by regulated entities, did not violate due process. *Id.* at 112, *overruled on other grounds by Allegheny Def. Project v. Fed. Energy Regul. Comm'n,* 964 F.3d 1 (D.C. Cir. 2020). Appellant argued that this structure violated due process because "the more pipelines that FERC approve[d] in the present, the greater its ability to seek larger appropriations from Congress in the future." *Id.*  The court emphasized that "Congress sets FERC's annual appropriation" and that, "whereas the mayor in *Dugan* sat on the five-member body that fixed his salary and exercised control over incoming fines, FERC commissioners enjoy no comparable degree of influence over Congress."  *Id.* (citation omitted).  Here, too, the USPTO recovers its annual operating costs through fees but is ultimately funded through congressional appropriation.

In *United States v. Benitez-Villafuerte*, the Fifth Circuit similarly concluded that "[a]lthough the INS's congressional funding depends to some extent on its statistical workload in apprehending and deporting illegal aliens, this fact provides too tenuous an influence" to violate due process.  186 F.3d 651, 660 (5th Cir. 1999).

14         MOBILITY WORKX, LLC v. UNIFIED PATENTS, LLC

Significantly, we rejected a similar challenge to the fee structure for reexamination proceedings, which at the time granted applicants "a refund of $1,200" if "the Commissioner decide[d] not to institute a reexamination proceeding." *Patlex Corp. v. Mossinghoff*, 771 F.2d 480, 487–88 (Fed. Cir. 1985) (rejecting argument that this fee structure "unlawfully weight[ed] the [US]PTO's initial decision in favor of granting reexamination, because only if reexamination [wa]s granted w[ould] the PTO avoid refunding $1,200 of the $1,500 fee for reexamination"). We found no due process violation, distinguishing *Tumey* and *Ward* because "in those cases the fines were discretionary and were levied at the initiative of those benefiting from the income; in the case of the [US]PTO the fees are set by Congress, and are paid by those members of the public who seek the benefits of the service." *Id.* at 487.

Here, as in *Delaware Riverkeeper*, *Benitez-Villafuerte*, and *Patlex*, congressional control of the USPTO's budget renders any agency interest in fee generation too tenuous to constitute a due process violation under *Tumey*.[5]

B

Mobility alternatively argues that individual APJs have an unconstitutional interest in instituting AIA

---

[5]    Other cases relied on by Mobility finding a due process violation similarly involved direct agency control over funds, rather than a congressional appropriation. *See Cain v. White*, 937 F.3d 446, 448, 454 (5th Cir. 2019); *Caliste v. Cantrell*, 937 F.3d 525, 526, 532 (5th Cir. 2019); *Esso Standard Oil Co. v. Lopez-Freytes*, 522 F.3d 136, 146 (1st Cir. 2008); *Rose v. Village of Peninsula*, 875 F. Supp. 442, 450–52 (N.D. Ohio 1995).

proceedings because their own compensation in the form of performance bonuses is favorably affected.

APJ compensation is governed by statute and regulation, and APJs recover a fixed salary. 35 U.S.C. § 3(b)(6) ("The Director may fix the rate of basic pay for the administrative patent judges . . . at not greater than the rate of basic pay payable for level III of the Executive Schedule under section 5314 of title 5."). However, APJs are also eligible to receive performance bonuses. APJ performance is evaluated by an annual performance review. These reviews look at four elements of performance: quality, production, support for the mission of the Board/leadership, and stakeholder interactions. APJs that are rated "fully successful" or higher are eligible for bonuses. Intervenor's Br. 9–10. To earn a performance bonus, an APJ must generally earn at least 84 decisional units per year, which Mobility asserts creates an incentive to institute IPR proceedings. Mobility contends that APJs can "receive a bonus of $4,000 to $10,000." Appellant's Br. 21.

Mobility makes a similar argument with respect to APJ salary increases, which are conditioned on performance reviews. Mobility contends that an "APJ's salary can be increased, up to five percent, depending on the APJ's numerical rating and final Performance Rating." *Id.*

Even accepting Mobility's characterization of APJ compensation, however, we conclude that APJs do not have a significant financial interest in instituting AIA proceedings to earn a bonus. Initially, we note that the number of decisional units earned by an APJ "is based upon the number of decisions authored" and "does not depend on the outcomes of those decisions." Intervenor's Br. 38. This stands in sharp contrast to *Tumey* and *Ward*, which involved fees that were only collected upon conviction of the defendants. *See Tumey*, 273 U.S. at 531; *Ward*, 409 U.S. at 58; *see also Dugan*, 277 U.S. at 65

(explaining that the mayor "receive[d] a salary which [wa]s not dependent on whether he convict[ed] in any case or not").

Even though an APJ will earn decisional units for a follow-on merits decision if he or she issues a decision instituting an AIA proceeding, there has been no showing that APJs institute AIA proceedings to earn sufficient decisional units to qualify for a bonus. Decisional units can be earned by participation in non-AIA proceedings, and there is a significant backlog of ex parte appeals. While APJs are generally assigned to specific jurisdictions of the Board (e.g., AIA proceedings or ex parte appeals), APJs are free to "request *ex parte* appeals to be added to his or her docket." J.A. 4355. Mobility does not dispute that APJs have access to non-AIA work or that there is sufficient non-AIA work for APJs to meet the 84 decisional unit threshold for additional compensation. Thus, even if there were an incentive to institute AIA proceedings to earn decisional units, any interest APJs have in instituting AIA proceedings to earn decisional units would be too remote to constitute a due process violation.[6]     *See, e.g., Del.*

---

[6]     The situation here is quite different from that prevailing in the cases relied on by Mobility. *See, e.g.*, *Esso*, 522 F.3d at 147 (Hearing Examiners working for the Puerto Rico Environmental Quality Board were independent contractors whose pay was "entirely dependent upon the discretionary assignment of cases from the" Environmental Quality Board); *Brown v. Vance*, 637 F.2d 272, 277, 281–82 (5th Cir. 1981) ("The income of judges in all Mississippi counties depend[ed] on the volume of criminal cases heard"; "law enforcement officers ha[d] discretion as to which judge in the district w[ould] hear each case"; and "the possibility exist[ed] that judges . . . w[ould] compete for business by currying favor with

*Riverkeeper*, 895 F.3d at 112 (rejecting due process challenge directed at agency's interest in "seek[ing] larger appropriations from Congress in the future"); *see also Van Harken v. City of Chicago,* 103 F.3d 1346, 1353 (7th Cir. 1997).

Mobility has therefore failed to establish that APJs have an unconstitutional financial interest in instituting AIA proceedings.[7]

IV

Mobility raises several additional constitutional challenges not raised before the agency that have been previously rejected by this court in other cases.

Mobility argues that the Director's delegation of his authority to institute AIA proceedings violates due process and the Administrative Procedure Act because the Director has delegated the initial institution decision to "the exact same panel of Judges that ultimately hears the case." Appellant's Br. 46. We have previously rejected a nearly identical challenge. *See Ethicon Endo-Surgery, Inc. v. Covidien LP*, 812 F.3d 1023, 1033 (Fed. Cir. 2016) ("[B]oth as a matter of inherent authority and general rulemaking authority, the Director had authority to delegate the institution decision to the Board. There is nothing in the Constitution or the statute that precludes the same Board

---

arresting officers or taking biased actions to increase their caseload.").

[7]    Amicus curiae US Inventor, Inc. presents a statistical study purportedly showing that there are more meritorious institution decisions in September (at the end of the APJ performance review year) than in October (at the beginning of the performance review evaluation period). This hardly establishes that APJs are instituting AIA proceedings to earn decisional units.

panel from making the decision to institute and then rendering the final decision.").

Mobility additionally argues that subjecting a pre-AIA patent to AIA review proceedings "constitutes an unlawful taking of property." Appellant's Br. 4. Again, we have previously rejected a nearly identical challenge. *See Celgene Corp. v. Peter*, 931 F.3d 1342, 1360 (Fed. Cir. 2019) ("In this case it suffices for us to decide that IPRs do not differ sufficiently from the PTO reconsideration avenues available when the patents here were issued to constitute a Fifth Amendment taking."), *cert. denied*, 141 S. Ct. 132 (2020).

V

Finally, Mobility raises an Appointments Clause challenge. We agree that a remand is required under the Supreme Court's decision in *Arthrex* to allow the Acting Director to review the final written decision of the APJ panel pursuant to newly established USPTO procedures. *See* https://www.uspto.gov/patents/patent-trial-and-appeal-board/procedures/uspto-implementation-interim-director-review (June 29, 2021); https://www.uspto.gov/sites/default/files/documents/20210701-PTAB-BoardsideChat-Arthrexfinal.pdf (July 1, 2021). However, Mobility now argues that it is entitled to more than a remand. Following the Supreme Court's decision in *Arthrex*, Mobility argued, for the first time, that we should instruct the Acting Director "to issue a certificate under [35 U.S.C.] § 318(b) confirming the challenged claims, or, in the alternative, dismissing [Unified Patent's] petition for failing to reach a final determination within the" 12-month statutory period for final determination in an inter partes review under 35 U.S.C. § 316(a)(11). Appellant's Br. in Resp. to *Arthrex* Order, ECF No. 85, at 2–3 (July 8, 2021). This argument, and any other challenge to the USPTO's implementation of Director review under *Arthrex*, should be raised before the agency on remand.

We therefore remand to the Board for the limited purpose of allowing Mobility the opportunity to request Director rehearing of the final written decision. Mobility must file any such request for rehearing within 30 days from the date of this decision. We will retain jurisdiction over this appeal during this limited remand. Within 14 days of a decision granting rehearing, the government shall inform this court of that decision and make any request to remand the case in full or continue the stay of proceedings. The government's request shall include a statement of consent or opposition. We decline to reach Mobility's merits challenge until the Acting Director has determined whether rehearing is warranted.

## REMANDED

### COSTS

No costs.

# United States Court of Appeals
# for the Federal Circuit

---

**MOBILITY WORKX, LLC,**
*Appellant*

**v.**

**UNIFIED PATENTS, LLC,**
*Appellee*

**ANDREW HIRSHFELD, PERFORMING THE
FUNCTIONS AND DUTIES OF THE UNDER
SECRETARY OF COMMERCE FOR
INTELLECTUAL PROPERTY AND DIRECTOR OF
THE UNITED STATES PATENT AND TRADEMARK
OFFICE,**
*Intervenor*

---

2020-1441

---

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2018-01150.

---

NEWMAN, *Circuit Judge*, concurring in part, dissenting in part.

I agree with the decision to remand this case to the Director of the U.S. Patent and Trademark Office for review of the final decision of the Patent Trial & Appeal Board (PTAB or "Board"). This remand implements the Supreme

Court's decision in *United States v. Arthrex, Inc.*, 141 S. Ct. 1970 (2021), as a way to achieve compliance with the Appointments Clause of the Constitution, for the Court observed that "the source of the constitutional violation is the restraint on the review authority of the Director, rather than the appointment of the APJs by the Secretary . . . ." *Id.* at 1988. The Court achieved constitutional compliance by authorizing the Director to review the PTAB's decisions.

The Court in *Arthrex* did not discuss any other aspect of this new (since 2012) system whereby issued patents are subject to review and cancellation by the Patent and Trademark Office (PTO). Mobility Workx raises several issues concerning this system, including constitutional issues. In addition, the Court's *Arthrex* decision now raises another possible Appointments Clause concern, stemming from the PTO's conduct of the procedure of "institution."

From my colleagues' endorsement of the status quo, I respectfully dissent.

## DISCUSSION

New technologies are the drivers of today's economy and the source of our national strength. New technologies present new complexities of law, science, and societal impact, with fresh issues of public and private interest. In the America Invents Act, legislators, inventors, technology industries, and other concerned interests sought to adapt the patent system to today's needs. Now, after a decade of experience with this Act, it is ripe for critical evaluation.

During the gestation of the America Invents Act, proponents stressed the burdens, delays, and costs of civil litigation, and sought to develop a more efficient system for review of the most common issues in patent litigation, through the administrative process and benefitting from the technological and legal expertise of the PTO. *See* H.R. Rep. No. 112-98, pt.1 at 48 (2011) (the purpose is "providing quick and cost effective alternatives to litigation"). Thus

the America Invents Act created a new mechanism whereby the most common issues of patent validity, *viz.* anticipation (§ 102) and obviousness (§ 103), can be reviewed by the PTO in an expedited agency procedure, with the result binding in any civil litigation. The review is conducted by a body called the Patent Trial and Appeal Board, whose members are designated "Administrative Patent Judges."

The procedure called "institution" was established by the America Invents Act in response to concerns that the proposed system of agency review would be subject to abuses such as harassment, delay, and opportunistic attacks on valuable patents, for there is no requirement of an Article III controversy for these agency proceedings, although the statute provides for cancellation (or enforcement) of property rights. The procedure of "institution" is intended to provide a safeguard against unwarranted agency procedures by requiring petitioners to meet an "elevated threshold" and establish "serious doubts about the patent's validity" before subjecting the patent owner to the burden and delay of this new procedure. 157 Cong. Rec. S1375 (daily ed. Mar. 8, 2011) (statement of Sen. Kyl). Senator Kyl explained:

> Among the most important protections for patent owners added by the present bill are its elevated thresholds for instituting inter partes and post-grant reviews. The present bill dispenses with the test of "substantial new question of patentability," a standard that currently allows 95% of all requests to be granted. It instead imposes thresholds that require petitioners to present information that creates serious doubts about the patent's validity. Under section 314(a), inter partes review will employ a reasonable-likelihood-of-success threshold . . . .

*Id.* The House Report at enactment similarly stated that the America Invents Act assures that these new agency

4          MOBILITY WORKX, LLC v. UNIFIED PATENTS, LLC

procedures "are not used as tools for harassment or a means to prevent market entry through repeated litigation and administrative attacks on the validity of a patent." H.R. Rep. No. 112-98, pt.1 at 48 (2011).

Mobility states that these promises have not been kept. Mobility states that the PTO's institution procedures are duplicative, expensive, delaying, and subject to bias. These aspects require more attention than my colleagues have accorded them, and raise new constitutional concerns.

### *The institution decision is final and nonappealable and its conduct raises Appointments Clause issues*

Guided by the Supreme Court's recent decision in *Arthrex*, the procedure of institution appears likely to violate the Appointments Clause, for institution, as it is currently conducted by the PTAB, is a final decision of an inferior officer, without supervision or control or review by a principal officer of the agency. Mobility also states that the institution procedure, as it is conducted by the PTAB, does not apply the elevated standard of the legislative purpose, and simply increases the burden on inventors and patent owners and the system of innovation.

The PTO's brief as Intervenor describes the conduct of institution as follows:

> AIA proceedings, including inter partes review, have two stages. First, the Board decides whether to institute proceedings. This decision is "final and nonappealable," 35 U.S.C. §§ 314(d), 324(e). If the agency decides to institute proceedings, the Board's final written decision as to patentability is subject to judicial review in this Court. *See id.* §§ 318(a), 319, 328(a), 329.

PTO Br. 8 (footnote omitted).

As the PTO brief states, "the Board decides whether to institute proceedings." *Id.* However, the America Invents Act assigned the institution decision to the Director, not the Board. The Act separated institution from adjudication, to be performed by separate administrative authorities:

> 35 U.S.C. § 314 – **Institution of inter partes review**
>
> (a) *Threshold.*—The Director may not authorize an inter partes review to be instituted unless the Director determines that the information presented in the petition filed under section 311 and any response filed under section 313 shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition.

Thus the Director decides whether a requested inter partes review will be conducted; the statute sets the timing for this decision:

> § 314(b) *Timing.*—The Director shall determine whether to institute an inter partes review under this chapter pursuant to a petition filed under section 311 and any response filed within 3 months after— (1) receiving a preliminary response . . . ; or (2) . . . the last date on which such response may be filed.

The Director's decision whether to institute review is final and is not appealable:

> § 314(d) *No Appeal.*—The determination by the Director whether to institute an inter partes review under this section shall be final and nonappealable.

The Supreme Court referred to the nonappealability of institution, in *Cuozzo Speed Technologies, LLC v. Lee*, 136 S. Ct. 2131 (2016):

6          MOBILITY WORKX, LLC v. UNIFIED PATENTS, LLC

> [W]here a patent holder merely challenges the Pa-
> tent Office's "determin[ation] that the information
> presented in the petition . . . shows that there is a
> reasonable likelihood" of success "with respect to at
> least one of the claims challenged," § 314(a), or
> where a patent holder grounds its claim in a stat-
> ute closely related to that decision to institute inter
> partes review, § 314(d) bars judicial review.

*Id.* at 2142 (alterations in original).  The Court was not con-
cerned in *Cuozzo* with the identity or appointment of the
decision-maker.

Although the America Invents Act assigned the insti-
tution decision to the Director, soon after enactment the
agency assigned institution to the PTAB, retaining no con-
trol or supervision or review by the Director.  *See Changes
to Implement Inter Partes Review Proceedings, Post-Grant
Review Proceedings, and Transitional Program for Covered
Business Method Patents*, 77 Fed. Reg. 48612-01 (Aug. 14,
2012):

> The authorities to determine whether to institute a
> trial and conduct a trial have been delegated to a
> Board member or employee acting with the author-
> ity of the Board.

*Id.* at 48647.

The removal of institution from the Director and as-
signment to the PTAB eliminated the legislative design
whereby separate entities conduct separate determina-
tions, as would also conform to the Administrative Proce-
dure Act.  The agency's explanation is "efficiency," the PTO
stating in *Ethicon* that "The Director's delegation of the in-
stitution decision to the Board is consistent with the statu-
tory purpose of increasing efficiency because it avoids the
need for two separate entities to become familiar with the
patent and the prior art."  Br. for PTO as Intervenor in *Eth-
icon Endo-Surgery Inc. v. Covidien LP*, at 33 (Fed. Cir.

Mar. 23, 2015) (No. 14-1771), ECF No. 33. However, this action not only contravenes the America Invents Act and the Administrative Procedure Act, but the placement of this final, nonappealable decision with an inferior officer also raises Appointments Clause concerns. As the Court explained in *Freytag v. Comm'r*, 501 U.S. 868 (1991), efficiency does not override the Constitution:

> Because it articulates a limiting principle, the Appointments Clause does not always serve the Executive's interests. For example, the Clause forbids Congress to grant the appointment power to inappropriate members of the Executive Branch. Neither Congress nor the Executive can agree to waive this structural protection. . . . The structural interests protected by the Appointments Clause are not those of any one branch of Government but of the entire Republic.

*Id.* at 880. The Court also pointed out that the right to raise a constitutional concern cannot be forfeited or waived. *Id.* at 879.

In *Arthrex* the PTO argued, as it does here, that the Director controls everything that happens in the PTO, to which the Court stated:

> [T]he unchecked exercise of executive power by an officer buried many layers beneath the President poses more, not less, of a constitutional problem.

141 S. Ct. at 1983. The issue is not whether PTAB members have the skill to make the institution decision and to do so impartially, as the PTO argues. The issue is whether this final nonappealable decision requires the authority of a principal officer.

This aspect is now before us, but it could benefit from further briefing in view of *Arthrex*. It cannot, after *Arthrex*, be dispatched as a non-issue, as the Federal Circuit held in *Ethicon Endo-Surgery, Inc. v. Covidien LP*, 812 F.3d 1023

(Fed. Cir. 2016) ("There is nothing in the Constitution or the statute that precludes the same Board panel from making the decision to institute and then rendering the final decision."). The Court in *Arthrex* confirmed the flaw in this reasoning, ruling that "[o]nly an officer properly appointed to a principal office may issue a final decision binding the Executive Branch in the proceeding before us." 141 S. Ct. at 1985. The Court stated:

> We hold that the unreviewable authority wielded by APJs during inter partes review is incompatible with their appointment by the Secretary to an inferior office. . . . Only an officer properly appointed to a principal office may issue a final decision binding the Executive Branch in the proceeding before us.

*Id.*

The PTAB's institution decision, whether for or against post-issuance review, binds the parties and is not appealable to the Director or to any court. The America Invents Act assigned this decision to the Director. With the *Arthrex* confirmation that the Director is a principal officer and the administrative patent judges are inferior officers, this court's reasoning in *Ethicon* appears to have been overtaken.

The status of the "institution" decision in light of *Arthrex* requires resolution, with application of the Court's ruling that PTAB final decisions must be controlled by a principal officer:

> Given the insulation of PTAB decisions from any executive review, the President can neither oversee the PTAB himself nor "attribute the Board's failings to those whom he can oversee." APJs accordingly exercise power that conflicts with the design of the Appointments Clause "to preserve political accountability."

*Arthrex*, 141 S. Ct. at 1982 (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 496 (2010) and *Edmond v. United States*, 520 U.S. 651, 663 (1997)).

This court should consider whether the removal of institution from the Director is in accordance with law and the Constitution.

Mobility and *amicus curiae* US Inventor also argue that the current conduct of institution raises Due Process issues, as I next outline.

### *Bias or the appearance of bias in the conduct of institution*

Mobility raises issues of both pre-judgment bias and structural bias. Mobility states that pre-judgment bias or the appearance of pre-judgment bias arises when the decision of unpatentability is made by the same APJs who made the decision for institution. Mobility further states that structural bias or the appearance of structural bias arises when the APJs charged with adjudication also control their workload via institution and administer a compensation structure based on a system that favors subjecting issued patents to agency review. Mobility states that the post-issuance procedures have destabilized the system of patents, to the detriment of the national interest in technological advance:

> The decision to seek a patent is fundamentally a decision to invest. To conceive of a new invention and reduce it to practice often requires a massive dedication of time, capital, and human effort. *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 480 (1974) ("The patent laws promote this progress by offering a right of exclusion for a limited period as an incentive to inventors to risk the often enormous costs in terms of time, research, and development.").

Mobility Br. 54.

Mobility states that the post-issue proceedings of the America Invents Act have not provided the promised benefits of speed, economy, and superior results as compared with district court proceedings, and often simply increase cost and delay. In addition to this failure of purpose, Mobility states that in their present form the PTO's procedures are contrary to the Administrative Procedure Act, the Due Process Clause and the America Invents Act.

### *Prejudging bias and the appearance of bias*

The appearance of bias is as important as actual bias, for confidence in the objectivity of adjudication is critical to a nation ruled by law. Prejudging bias is a recognized concern in adjudication. The concern here is the current conduct of institution, where the same panel of APJs decides whether to institute review, and then conducts the trial and finally decides the question. The America Invents Act separated these functions, as does the Administrative Procedure Act:

> 5 U.S.C. § 554(d)(2) [¶ 2]. An employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review . . . except as witness or counsel in public proceedings.

Despite this stricture, the PTO combined the investigative and adjudicative functions, as discussed *ante* with respect to the Appointments Clause. When the PTO requested public comments on the shift of the institution function from the Director to the PTAB, the patent bar expressed concern about the actual or perceived bias against the patent owner because the administrative patent judges are put in the position of defending their prior decisions to institute the review. AIPLA, Comments on Trial Proceedings Under the America Invents Act Before the Patent Trial and

Appeal Board, 20 (October 16, 2014), http://www.uspto.gov/ip/boards/bpai/aipla_20141016.pdf.

The Pharmaceutical Researchers and Manufacturers of America stated similar concerns:

> The AIA thus separates the responsibility for instituting an IPR or PGR from the responsibility for conducting an instituted IPR or PGR. The PTAB's role under the AIA is specifically limited to "conduct[ing]" a review that was already "instituted." Separating the decision to institute on IPR or PGR from the PTAB's decision on the merits would increase patent owners' due process protections, reduce perceptions of bias, and more fully meet the requirements of the AIA.

Pharm. Researchers & Mfrs. of Am., Comments on Trial Proceedings Under the America Invents Act Before the Patent Trial and Appeal Board, 14 (October 16, 2014), https://www.uspto.gov/sites/default/files/ip/boards/bpai/phrma_20141016.pdf (alterations in original).

Commentator Public Knowledge observed that "it is unsurprising that the Board has generally invalidated patents it reviews" because "[r]eview before the Board will only be granted where it is likely" in the view of the same APJs who will conduct the trial and decide the case, "that at least one claim will be cancelled." Public Knowledge, Comments on Trial Proceedings Under the America Invents Act Before the Patent Trial and Appeal Board, 5 (September 30, 2014), https://www.uspto.gov/sites/default/files/ip/boards/bpai/public_knowledge_20140930.pdf (supporting the current structure).

The PTO responded to these concerns by rejecting the possibility of prejudging bias on the part of PTO employees:

> The Office believes that the panel deciding whether to institute an AIA proceeding is not predisposed to rule in favor of any party, whether the petitioner or

patent owner, and that each panel applies the appropriate legal standard to make a fair and unbiased decision based upon the evidence and arguments of record.

*Amendments to the Rules of Practice for Trials Before the Patent Trial and Appeal Board*, 80 Fed. Reg. 50720-01, 50740 (Aug. 20, 2015).

Scholars of cognition are not so sanguine, and "have repeatedly documented the tendency for people to justify past conduct, especially when that conduct casts doubt on their competence or integrity and is public knowledge," reporting that: "Accountable subjects had a harder time than unaccountable subjects in writing off 'sunk costs' and in acknowledging that they had made a mistake." Philip E. Tetlock, Linda Skitka & Richard Boettger, *Social and Cognitive Strategies for Coping with Accountability: Conformity, Complexity, and Bolstering*, 57 J. Personality & Soc. Psychol. 632, 633 (1989).

The Court has remarked, in connection with the growth of quasi-adjudicative functions in administrative agency activity, that:

> [L]egislators and others concerned with the operations of administrative agencies have given much attention to whether and to what extent distinctive administrative functions should be performed by the same persons.

*Withrow v. Larkin*, 421 U.S. 35, 51 (1975) (discussing Congress' various approaches to the problems of investigative bias, stating: "For the generality of agencies, Congress has been content with § 5 of the Administrative Procedure Act, 5 U.S.C. § 554(d), which provides that no employee engaged in investigating or prosecuting may also participate or advise in the adjudicating function, but which also expressly exempts from this prohibition 'the agency or a member or members of the body comprising the agency.'").

The concern is not only the possibility of bias, including unconscious bias, but also the appearance of bias. The Administrative Procedure Act confronted the issue by requiring that different persons should perform the investigative and the adjudicative functions of a given issue. The Court explained in *Wong Yang Sung v. McGrath*, 339 U.S. 33 (1950), that § 554(d) was included in the APA to "ameliorate the evils from the commingling of functions" where "[t]he discretionary work of the administrator is merged with that of the judge." *Id.* at 42, 46. The separation of investigative and decisional functions is necessary, the Court explained, lest the agency decision "lie under the suspicion of being rationalizations of the preliminary findings which the commission, in the role of prosecutor, presented to itself." *Id.* at 42 (internal quotation marks omitted). The Court summarized: "The Administrative Procedure Act did not go so far as to require a complete separation of investigating and prosecuting functions from adjudicating functions. But that the safeguards it did set up were intended to ameliorate the evils from the commingling of functions as exemplified here is beyond doubt." *Id.* at 46.

Bias is not a simple concept, and may be unconscious, as the Court observed in *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905 (2016), where the Court referred to the:

> risk that the judge "would be so psychologically wedded" to his or her previous position as a prosecutor that the "judge would consciously or unconsciously avoid the appearance of having erred or changed position."

*Id.* at 1906 (quoting *Withrow*, 421 U.S. at 57). The Court observed that bias may not be recognized by the biased person, and imposed the rule that "under the Due Process Clause there is an impermissible risk of actual bias when a judge earlier had significant, personal involvement as a prosecutor in a critical decision regarding the defendant's

14          MOBILITY WORKX, LLC v. UNIFIED PATENTS, LLC

case." *Id.  See Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009):

> The judge's own inquiry into actual bias, then, is not one that the law can easily superintend or review, though actual bias, if disclosed, no doubt would be grounds for appropriate relief. In lieu of exclusive reliance on that personal inquiry, or on appellate review of the judge's determination respecting actual bias, the Due Process Clause has been implemented by objective standards that do not require proof of actual bias.

*Id.* at 883.  The Court has stressed that "any tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias." *Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 150 (1968).  The Court stated:

> To establish an enforceable and working framework, the Court's precedents apply an objective standard that, in the usual case, avoids having to determine whether actual bias is present.

*Williams*, 136 S. Ct. at 1905.

In sum, there must be confidence in objective adjudication in any contested proceeding that is entrusted to government.    An    administrative    agency    performing adjudicative functions is no less subject to these concerns. *See Gibson v. Berryhill*, 411 U.S. 564, 579 (1973) ("It has also come to be the prevailing view that '[m]ost of the law concerning disqualification because of interest applies with equal force to . . . administrative adjudicators.'" (quoting Kenneth Culp Davis, ADMINISTRATIVE LAW § 12.04, p. 250 (1972) (alterations in original)).

The America Invents Act was structured to avoid these concerns by simply separating the threshold investigative function from the adjudicative function, along with the authorities  performing  them.    My  colleagues  err  in  their

perfunctory ratification of the current practice, particularly when the issue could be resolved simply by restoring the Director to the statutory role in the institution procedure.

### *Structural bias and the appearance of bias*

Mobility also raises issues of structural bias, based on the PTAB's fee and compensation structures. Data and statistical analysis have been submitted by *amicus curiae* US Inventor. Mobility cites *Esso Standard Oil Co. v. Lopez-Freytes*, 522 F.3d 136 (1st Cir. 2008), for the proposition that "[a]lthough members of the EQB Governing Board may not stand to gain personally . . . a pecuniary interest need not be personal to compromise an adjudicator's neutrality." *Id.* at 147 (quoting *Esso Standard Oil Co. v. Cotto*, 389 F.3d 212, 219 (1st Cir. 2004) (alterations in original)).

The PTO defends its objectivity, and my colleagues give scant weight to Mobility's charge. However, there is no "feeling, so important to a popular government, that justice has been done." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980) (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 172 (1951) (Frankfurter, J., concurring)).

In *Patlex Corp. v. Mossinghoff*, 758 F.2d 594 (Fed. Cir. 1985), this court considered the newly enacted system of inter partes reexamination, and stated:

The Commissioner reminds us of the complex structure of modern government through administrative agencies, and we agree that such delegation of administrative functions, often including quasi-judicial functions, is now beyond facial challenge— provided that constitutional safeguards are respected. The massive body of jurisprudence that suffered the evolution of administrative agencies in

> the federal government insisted on fair opportunity
> for judicial review and full respect for due process.

*Id.* at 604.  Mobility flags this "respect for due process," in asking this court to assure that the PTO and its tribunal are adequately scrupulous in their avoidance of bias and the appearance of bias.  "[J]ustice must satisfy the appearance of justice," *Offutt v. United States*, 348 U.S. 11, 14 (1954).  This is our responsibility.  From my colleagues' facile endorsement of the present system, although these due process concerns are not resolved, I respectfully dissent.