Dissenting opinion filed by Circuit Judge NEWMAN.
O'Malley, Circuit Judge.
*1369 In response to two petitions for inter partes review filed by Appellee Apple Inc. ("Apple"), the Patent Trial and Appeal Board ("Board") issued a pair of final written decisions finding claims 1-4 and 9-10 of U.S. Patent No. 6,128,290 ("the '290 patent"), owned by Appellant DSS Technology Management, Inc. ("DSS"), unpatentable as obvious. Apple Inc. v. DSS Tech. Mgmt., Inc. , No. IPR2015-00369, 2016 WL 3382361 (P.T.A.B. June 17, 2016) ( Apple I ); Apple Inc. v. DSS Tech. Mgmt., Inc. , No. IPR2015-00373, 2016 WL 3382464 (P.T.A.B. June 17, 2016) ( Apple II ). Because we find that the Board did not provide a sufficient explanation for its conclusions, and because we cannot glean any such explanation from the record, we reverse.
I. BACKGROUND
A. The '290 patent
The '290 patent, which issued in 2000 and is assigned to DSS, is directed to a wireless communication network for a single host device and multiple peripheral devices. The '290 patent discloses a data network for bidirectional wireless data communications between a host or server microcomputer-described in the specification as a personal digital assistant or "PDA"-and a plurality of peripheral devices that the specification refers to as personal electronic accessories or "PEAs." '290 patent, col. 1, ll. 11-20, col. 2, ll. 15-18. According to the '290 patent, this data network provides "highly reliable" communication, "requires extremely low power consumption, particularly for the peripheral units," "avoids interference from nearby similar systems," and "is of relatively simple and inexpensive construction." Id. at col. 1, ll. 33-47. Figure 1 of the '290 patent illustrates an embodiment of this wireless data network:
*1370 Id. at Fig. 1. This figure depicts a server microcomputer, shown as PDA 11 , and a plurality of peripheral units 21 to 29 . Id. at col. 2, ll. 42-44, col. 2, l. 66-col. 3, l. 15.
The '290 patent teaches that the transmitters within the host or server microcomputer and the peripheral units in the data network operate in a "low duty cycle pulsed mode of operation." Id. at col. 1, ll. 57-59. In such a mode of operation, each peripheral unit is allocated a subset of available time slots in which it receives or transmits data from or to the server microcomputer in radio frequency (i.e., wireless) bursts. Id. at col. 3, l. 57-col. 4, l. 6. These time slots are determined in relation to synchronizing information initially transmitted from the server microcomputer. Id. at col. 2, ll. 35-39. In the time slots when a peripheral unit is neither receiving nor transmitting, its reception and transmission circuitry may be powered down. Id. at col. 4, ll. 6-8. "The low duty cycle pulsed operation both substantially reduces power consumption and facilitates the rejection of interfering signals." Id. at col. 1, ll. 59-61.
The '290 patent contains 11 apparatus claims, six of which-claims 1-4 and 9-10-are relevant to this appeal. Because the parties dispute only a single claim limitation recited in independent claim 1, they agree that claim 1 is representative. Claim 1 recites:
A data network system for effecting coordinated operation of a plurality of electronic devices, said system comprising:
a server microcomputer unit;
a plurality of peripheral units which are battery powered and portable, which provide either input information from the user or output information to the user, and which are adapted to operate within short range of said server unit;
said server microcomputer incorporating an RF [radio frequency] transmitter for sending commands and synchronizing information to said peripheral units;
said peripheral units each including an RF receiver for detecting said commands and synchronizing information and including also an RF transmitter for sending input information from the user to said server microcomputer;
said server microcomputer including a receiver for receiving input information transmitted from said peripheral units;
said server and peripheral transmitters being energized in low duty cycle RF bursts at intervals determined by a code sequence which is timed in relation to said synchronizing information.
'290 patent, col. 11, l. 62-col. 12, l. 18 (emphasis added).
The only disputed limitation of claim 1 pertains to the "low duty cycle RF bursts" referenced above. Claim 1 requires both the server microcomputer and each of the peripheral units to comprise transmitters. According to the claim, the server microcomputer's transmitter is used "for sending commands and synchronizing information to said peripheral units," while the peripheral unit's transmitters are used "for sending input information from the user to said server microcomputer." Id. at col. 12, ll. 4-11. The transmitters on both the server microcomputer and the peripheral units must be "energized in low duty cycle RF bursts." Id. at col. 12, ll. 15-18. This limitation was the focus of the IPR proceedings below, and it is at the center of the single dispute on appeal.
B. Relevant Prior Art
The Board relied on two pieces of prior art in the IPR proceedings: U.S. Patent No. 5,241,542 to Natarajan et al. ("Natarajan"), *1371 and U.S. Patent No. 4,887,266 to Neve et al. ("Neve"). In its final written decisions, the Board found that the combination of Natarajan and Neve rendered obvious all of the challenged claims of the '290 patent. Apple I , 2016 WL 3382361, at *1, *19 ; Apple II , 2016 WL 3382464, at *1, *19. Of the two prior art references, only Natarajan is relevant to this appeal.
As the Board described it, "Natarajan is directed to power conservation in wireless communication, particularly battery efficient operation of wireless link adapters of mobile computers (also referred to, inter alia , as battery powered computers, hand held or laptop computers, mobile units, and mobile stations) as controlled by multiaccess protocols used in wireless communication." Apple I , 2016 WL 3382361, at *8. Figure 2 of Natarajan depicts this system:
Natarajan, Fig. 2. This block diagram shows mobile stations 10 , 12 , 14 , and 16 , which communicate via wireless transceivers within transceiver adapters 44 and 36 with base stations 26 and 28 , which are in turn connected to server 18 . Id. at col. 2, ll. 32-39, 51-52, 58-59, 65-67.
According to Natarajan, "the main idea for minimizing battery power consumed by wireless link adapters at the mobile units" depends on the "scheduled access multiaccess protocol" through which the mobile units communicate with the base station. Id. at col. 3, l. 59-col. 4, l. 6, col. 4, ll. 20-23. These protocols "can be implemented to effectively conserve battery power by suitable control of the state of transmitter and receiver units at the portable units (i.e., by scheduling when they should be turned ON or OFF)." Id. at col. 3, l. 66-col. 4, l. 3. "A desirable solution is one in which the transmitter (or receiver) consumes power only when it is actively transmitting a message (or actively receiving a message)." Id. at col. 4, ll. 3-6.
Natarajan's scheduled multi-access protocol achieves this goal by dividing time into fixed-length frames, which are themselves divided into slots. Id. at col. 4, ll. 20-23. Figure 4 of Natarajan shows an exemplary frame:
*1372 Id. , Fig. 4.
The frame is divided into three subframes: A, B, and C. Id. at col. 4, ll. 28-38. The first subframe, period A, is used "for broadcast of [data] packets from base station to mobile units (outbound traffic)." Id. at col. 4, ll. 30-32. The second subframe, period B, is used for "contention-free transfer of all traffic from mobile units to base station (inbound traffic)." Id. at col. 4, ll. 33-35. The third subframe, period C, is "for the transfer of all bursty data traffic in a contention mode from mobile units to base station (inbound traffic)." Id. at col. 4, ll. 36-38. Each of subframes A and B in this example is associated with a header, AH and BH, respectively, that is broadcast by the base station to all mobile stations at the start of the subframe. Id. at col. 4, ll. 30-35. Using these headers, each mobile unit can compute exactly when it should be ready to receive data from the base station and when it should begin transmitting data to the base station. Id. at col. 4, l. 67-col. 5, l. 2; id. at col. 5, ll. 20-22. The mobile unit can turn its receiver or transmitter off to save power during those time slots in which the mobile unit is not receiving or transmitting data. Id. at col. 5, ll. 2-6, 23-29.
C. Procedural History
Apple concurrently filed two IPR petitions related to the '290 patent on December 4, 2014. Apple's first petition challenged the validity of claims 1-4 of the '290 patent, and the second challenged the validity of claims 6, 7, 9, and 10. The Board instituted two IPRs on June 25, 2015, as IPR2015-00369 and IPR2015-00373, respectively. It instituted the first IPR to determine whether claims 1 to 4 were obvious over Natarajan and Neve. The Board instituted the second IPR on the same basis, as well as on the ground that claims 6 and 7 allegedly were obvious over U.S. Patent No. 5,696,903 to Mahany. DSS later disclaimed claims 6 and 7 of the '290 patent.
The Board issued its final written decisions in both IPRs on June 17, 2016. The Board found that all remaining challenged claims-claims 1-4, 9, and 10-were invalid as obvious over Natarajan in view of Neve. Apple I , 2016 WL 3382361, at *1, *19 ; Apple II , 2016 WL 3382464, at *1, *19.[1] DSS conceded that all but one limitation in each of these claims was disclosed in Natarajan and Neve. Apple I , 2016 WL 3382361, at *10-11. But DSS disputed that either reference disclosed the limitation "said server ... transmitter[ ] being energized in low duty cycle RF bursts." Id. at *11.
The Board construed the term "energized in low duty cycle RF bursts" as "energized, in short periods of intense RF transmission activity on an otherwise quiet *1373 data channel, only to the extent required to satisfy the data transmission needs over the course of a communication cycle." Id. at *4-7. The Board explained that it "underst[oo]d the 'duty cycle' of a transmitter to be the average ratio of the durations during which the transmitter is energized to the [total] duration of communication cycles over the course of network operation." Id. at *6.
The Board then turned to the question of obviousness. Apple argued that, because the mobile unit transmitters in Natarajan operated in "low duty cycle RF bursts," "it would have been plainly obvious to a [person of ordinary skill in the art] to have the base station operate in an analogous manner." Id. at *13 (alteration in original). Apple explained that, because the "low duty cycle RF bursts" limitation was not novel and because "the base and mobile stations have the same physical structure," it "would have been no more than using a known technique to improve similar devices in the same way." Id.
Although DSS admitted that Natarajan discloses a system for reducing power consumption in mobile units, DSS argued that Natarajan says nothing about doing the same for the base station transmitter. Id. at *12. DSS noted that the stated goal of the Natarajan reference is to provide energy savings for the mobile units, not the base station. Id. DSS also observed that the base station in Natarajan uses a different communications scheme than the mobile units, where the base station transmits continuously during the time slots designated for outbound traffic and cannot be turned off at any point during that period. Id.
The Board was "persuaded by each of Apple's arguments presented above." Id. at *15. It found that "Natarajan is expressly concerned with 'power conservation due to wireless communication,' and specifically, with 'battery efficient operation of wireless link adapters of mobile computers as controlled by multiaccess protocols used in wireless communication.' " Id. (quoting Natarajan, col. 1, ll. 7-13). The Board acknowledged that Natarajan describes only the mobile units as battery-powered devices, but it noted that the base units also are conventional microcomputers and contain similar wireless communication components as the mobile units. Id. (citing Natarajan, col. 2, ll. 40-41, col. 2, l. 51-col. 3, l. 2).
From this, the Board concluded "that a person of ordinary skill in the art would have been motivated by Natarajan to apply the same power-conserving techniques to base units as it is disclosed with respect to mobile units, as well as that it would have been within the skill of the ordinarily skilled artisan to do so." Id. The PTAB found "no persuasive evidence of record that it would have been 'uniquely challenging or difficult for one of ordinary skill in the art' to do so." Id. (quoting Leapfrog Enters., Inc. v. Fisher-Price, Inc. , 485 F.3d 1157, 1162 (Fed. Cir. 2007) ). The Board noted that, "as the [Supreme] Court explained in KSR , the skilled artisan is 'a person of ordinary creativity, not an automaton.' " Id. (quoting KSR Int'l Co. v. Teleflex Inc. , 550 U.S. 398, 420-21, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007) ).
DSS appeals this single aspect of the Board's decisions. We have jurisdiction over this appeal under 28 U.S.C. § 1295(a)(4). See Shaw Indus. Grp., Inc. v. Automated Creel Sys., Inc. , 817 F.3d 1293, 1297 (Fed. Cir. 2016).
II. DISCUSSION
"Obviousness is a question of law based on underlying findings of fact."
*1374 In re Kubin , 561 F.3d 1351, 1355 (Fed. Cir. 2009). We review the factual findings underlying the Board's obviousness determination for substantial evidence, whereas we review its legal conclusions de novo . In re Gartside , 203 F.3d 1305, 1316 (Fed. Cir. 2000).
A patent is obvious "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). "Though less common, in appropriate circumstances, a patent can be obvious in light of a single prior art reference if it would have been obvious to modify that reference to arrive at the patented invention." Arendi S.A.R.L. v. Apple Inc. , 832 F.3d 1355, 1361 (Fed. Cir. 2016) (citations omitted).
The sole issue on appeal is the Board's finding that it would have been obvious to modify the base station transmitter in Natarajan to be "energized in low duty cycle RF bursts," as required by the claims of the '290 patent. Apple I , 2016 WL 3382361, at *15.[2] We hold that the Board's final written decisions fail to provide sufficient explanation for its obviousness finding.
As we observed in Arendi , "common sense and common knowledge have their proper place in the obviousness inquiry," at least "if explained with sufficient reasoning." 832 F.3d at 1361 (quoting Perfect Web Techs., Inc. v. InfoUSA, Inc. , 587 F.3d 1324, 1328 (Fed. Cir. 2009) ). "But," we cautioned, "there are at least three caveats to note in applying 'common sense' in an obviousness analysis." Id. "First, common sense is typically invoked to provide a known motivation to combine , not to supply a missing claim limitation." Id. at 1361-62 (citing DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co. , 464 F.3d 1356, 1360, 1368, 1371 (Fed. Cir. 2006), and Randall Mfg. v. Rea , 733 F.3d 1355, 1356, 1363 (Fed. Cir. 2013) ). Second, we have invoked common sense to fill in a missing limitation only when "the limitation in question was unusually simple and the technology particularly straightforward." Id. at 1362 (citing Perfect Web , 587 F.3d at 1326 ). "Third, our cases repeatedly warn that references to 'common sense'-whether to supply a motivation to combine or a missing limitation-cannot be used as a wholesale substitute for reasoned analysis and evidentiary support, especially when dealing with a limitation missing from the prior art references specified." Id.
The Board's invocation of "ordinary creativity" is no different from the reference to "common sense" that we considered in Arendi . See id. at 1361 (noting that the obviousness analysis should take into account "the knowledge, creativity, and common sense that an ordinarily skilled artisan would have brought to bear when considering combinations or modifications" (quoting Randall , 733 F.3d at 1362 ) ). Here, the Board relied on a gap-filler-"ordinary creativity" instead of "common sense"-to supply a missing claim limitation. Id. at 1361. "In cases in which 'common sense' is used to supply a missing limitation, as distinct from a motivation to *1375 combine, ... our search for a reasoned basis for resort to common sense must be searching." Id. at 1363. The Board's reliance on "ordinary creativity" calls for the same "searching" inquiry.
As in Arendi , the limitation at issue here is not "unusually simple," and the technology is not "particularly straightforward." Id. at 1362. The '290 patent devotes the bulk of its written description to the complex communications protocol that enables the claimed "low duty cycle" mode of operation. '290 patent, col. 5, l. 46-col. 11, l. 52. As the Board's claim construction discussion demonstrates, the question of whether a transmitter is "energized in low duty cycle RF bursts" is not an easy one. Apple I , 2016 WL 3382361, at *4-7. The missing limitation, moreover, "plays a major role in the subject matter claimed." Arendi , 832 F.3d at 1362. Unlike the Natarajan reference, the '290 patent contemplates a server that is itself a mobile device, and a stated object of the patent is for this server to have "extremely low power consumption." '290 patent, Fig. 1, col. 1, ll. 33-47. The '290 patent explains that the low duty cycle pulsed mode of operation is critical to achieving this goal. Id. at col. 1:59-61.
With these precepts in mind, we find that the Board's decisions do not satisfy the standard set forth in Arendi . The full extent of the Board's analysis is contained in a single paragraph. Apple I , 2016 WL 3382361, at *15. After acknowledging that Natarajan does not disclose a base unit transmitter that uses the same power conservation technique, the Board concluded that a person of ordinary skill would have been motivated to modify Natarajan to incorporate such a technique into a base unit transmitter and that such a modification would have been within the skill of the ordinarily skilled artisan. Id. In reaching these conclusions, the Board made no further citation to the record. Id. It referred instead to the "ordinary creativity" of the skilled artisan. Id. (quoting KSR , 550 U.S. at 420-21, 127 S.Ct. 1727 ). This is not enough to satisfy the Arendi standard.
Apple argues that this characterization of the Board's analysis ignores the previous eight pages of discussion. Those pages, however, are devoted solely to enumerating the parties' arguments. Even if we assume that the Board incorporated any or all of Apple's arguments by reference by stating that it was "persuaded by each of Apple's arguments presented above," id. , only one paragraph of the Board's summary of Apple's arguments is relevant to the Board's obviousness conclusion. This paragraph quotes Apple's argument that "it would have been plainly obvious to a [person of ordinary skill in the art] to have the base station operate in an analogous manner" to the mobile units. Id. at *13 (alteration in original). The Board also repeated Apple's assertion that, "[b]ecause the base and mobile stations have the same physical structure, this would have been no more than using a known technique to improve similar devices in the same way." Id. (alteration in original).
The Board parenthetically noted the evidence that Apple cited in support of these contentions, which consisted solely of paragraphs of a declaration from Apple's expert, Dr. Hu.[3] She opined that "it would have been obvious to a [person of ordinary *1376 skill in the art] to have the base station [in Natarajan] operate in an analogous manner" to the mobile units, which the parties agreed operated in "low duty cycle RF bursts." J.A. 1994, ¶ 45. She noted that "[t]he RF systems of the base station and mobile stations in Natarajan have the same physical structure." Id. (citing Natarajan, col. 3, ll. 7-8, Fig. 3). She then explained that a person of skill in the art "applying the exact design disclosed in Natarajan to an application exactly as described in Natarajan," where most users are likely to be inactive most of the time, "would have conceived a system in which ... the transmitter and the receiver of the base station ... operate in 'low duty cycle RF bursts.' " Id. (citing Natarajan, col. 6, ll. 41-44). Dr. Hu therefore concluded that a person of skill in the art would not have found the "low duty cycle RF bursts" limitation to be "novel." Id.
To the extent the Board's obviousness findings were based on Dr. Hu's testimony-which is questionable, because the Board never cited her testimony directly-her "conclusory statements and unspecific expert testimony" are insufficient to support the Board's findings. Arendi , 832 F.3d at 1366 ; see also Icon Health & Fitness, Inc. v. Strava, Inc. , 849 F.3d 1034, 1047 (Fed. Cir. 2017) ("[T]he [Board] is permitted to credit a party's argument as part of its reasoned explanation of its factual findings; however, the [Board] must 'explain[ ] why [it] accepts the prevailing argument.' " (alterations in original) (quoting In re NuVasive, Inc. , 842 F.3d 1376, 1383 (Fed. Cir. 2016) ) ).[4] Dr. Hu and the Board failed to consider that Natarajan's multi-access protocol imposes different transmission requirements on the base station and the mobile units. In the only exemplary embodiment in Natarajan, as DSS points out, the base station allocates transmission time slots for a mobile unit only if the base station has data to transmit to the mobile unit. Natarajan, col. 4, ll. 39-53; id. at col. 7, ll. 59-66, Fig. 6. Each mobile unit transmitter is energized only during the mobile unit's assigned time slot for transmission, whereas the base station transmitter is energized for the entirety of time period A, during which the base station transmits data to the mobile units. Id. at col. 4, l. 20-col. 5, l. 29. Dr. Hu admitted these facts in her deposition. Neither Dr. Hu nor the Board, moreover, analyzed whether, if the base station transmitter in Natarajan were modified, its transmissions would be characterized by "short periods of intense RF transmission activity on an otherwise quiet data channel ," as required by the Board's own claim construction. Apple I , 2016 WL 3382361, at *7 (emphasis added).[5] The similarities *1377 in transmission hardware cannot close these gaps without additional, reasoned analysis.
For these reasons, Dr. Hu's testimony does not constitute substantial evidence that is capable of supporting the Board's conclusions "that a person of ordinary skill in the art would have been motivated by Natarajan to apply the same power-conserving techniques to base units as it is disclosed with respect to mobile units, as well as that it would have been within the skill of the ordinarily skilled artisan to do so." Id. at *15. The Board thus relied on "ordinary creativity" "as a wholesale substitute for reasoned analysis and evidentiary support," and did so "when dealing with a limitation missing from the prior art references specified." Arendi , 832 F.3d at 1362. Without "a reasoned explanation that avoids conclusory generalizations," this was not sufficient. Id. at 1366 (quoting Perfect Web , 587 F.3d at 1329 ).
We also find "that this is not a case where a more reasoned explanation than that provided by the Board can be gleaned from the record." Id. Dr. Hu's testimony suffers from the serious deficiencies that we have discussed above, and Apple suggests no other evidence that might remedy those defects. Apple failed to meet its burden of establishing that the challenged claims of the '290 patent were obvious. We therefore reverse the Board's finding of unpatentability.
III. CONCLUSION
For the foregoing reasons, we reverse the Board's findings that claims 1-4 and 9-10 of the '290 patent are obvious over the combination of Natarajan and Neve.
REVERSED
COSTS
No costs.

The two final written decisions are identical in all relevant respects. We hereafter cite only to the first final written decision for simplicity.

Apple admits that the Board did not adopt Apple's argument that Natarajan expressly discloses a server transmitter energized in low duty cycle RF bursts. Appellee's Br. 29. Apple has not cross-appealed this issue.

We note DSS's contention that Apple did not present this expert declaration with its initial petition for inter partes review. [Reply 24-26.] Because DSS has not appealed the Board's reliance on this evidence, however, we do not decide whether this violated the applicable statutes and rules. See Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd. , 821 F.3d 1359, 1369-70 (Fed. Cir. 2016) (affirming the Board's refusal to consider an argument "raised for the first time in [an IPR petitioner's] reply brief and expert declaration").

Under the Chenery doctrine, we decline Apple's invitation to consider evidence that the Board did not cite in its decision. See Bd. of Trs. of Leland Stanford Junior Univ. v. Chinese Univ. of H.K. , 860 F.3d 1367, 1376 (Fed. Cir. 2017) (citing SEC v. Chenery Corp. , 332 U.S. 194, 196, 67 S.Ct. 1760, 91 L.Ed. 1995 (1947) ) ("We must base our review on the analysis presented by the Board.").

In her dissent, Judge Newman does not discuss the portion of the Board opinion where it explains the rationale for its holding and, instead, relies heavily on the Board's statement that
"energized in low duty cycle RF bursts" simply means that a transmitter is not energized continuously over the course of network operation, but is depowered during at least two time periods of each communication cycle: first, in time slots in which the unit that includes the transmitter is assigned to receive data; and second, in time slots, if any, when the unit is assigned to transmit data but has no data to transmit.
Apple I , 2016 WL 3382361, at *7. But the dissent reads too much into this sentence. Taken out of context, this passage contradicts the Board's own explicit claim construction, because it does not incorporate the "short periods" and "otherwise quiet data channel" aspects of that construction. For example, if a transmitter is continuously transmitting data-that is, it is never assigned to receive data and always has data to transmit-the transmitter would satisfy the requirements of the sentence quoted above. But the transmission activity would not be in "short periods," and the data channel would not be "otherwise quiet." It follows that the Board's claim construction requires more than the quoted passage.